May it please the Court, the A's fight for federal defenders on behalf of the appellant, Mr. Galvez. The proffered instructions here met all three criteria to justify a defense special instruction. Additionally, they were concise, straightforward, and non-argumentative. The district court abused its discretion in refusing to charge the jury with correct legal definitions of two terms of art This warrants reversal under Thomas and Mason. At the outset, I want to stress one thing that maybe wasn't clear from the briefs. The government never objected to these instructions below. Never said they were unclear. Never said they were argumentative. Never said they were incorrect. Never said they were superfluous. In fact, they argued just the opposite. They weren't not superfluous. But they asked for even more detail going into legitimation. So what was the basis for the district court's rejection for the definitions? Your Honor, all the district court said is, I'm going to leave this to argument. No reason was given. And I can't think of any. They weren't overlong. There were three sentences for the marriage definition. One sentence for the residency, if it were extracted from a larger instruction. It could have easily been put into the judge's alien instruction, alienage instruction. So we're really talking about four sentences. There was nothing else in the charge that came remotely close. There were only four special instructions in the charge. The rest were model jury instructions, which of course don't talk about marriage under Mexican law or define residency for the relevant period here. Did the government dispute whether, in fact, if there were, say, a religious marriage but no civil marriage, that would not count for Federal purposes because it didn't count for Mexican purposes? The government's argument was rather general in that they said that the derivative citizenship, that Mr. Galvez had not made his case for derivative citizenship. I understand that. But was there agreement or a lack of disagreement about the way the Federal marriage requirement or non-marriage requirement for this very strange statute that for some reason has a completely different time period depending on whether you were married or not, that if, in fact, his parents were in what Mexico calls a free union, which I gather would include a church wedding, if there wasn't a civil wedding, did the government agree, accede, or has it ever disagreed that that would, for Federal purposes, bring her into the single mother category? It's the last of those options, Your Honor, as far as I can tell from the record, is that the government never claimed that this instruction was incorrect, that that wasn't true, that in Mexico marriage requires a civil marriage, that religious ceremonies are not sufficient, or non-ceremonies. But it's actually the same in the United States. You have to go get a marriage license. The civil portion has to be taken care of in the United States by the clerk. You go get your license, and then you can do it however you want to do it, but you still have to deal with the state. Well, two answers to that, Your Honor. One is that actually today the word marriage is probably no more controversial word in the English language in this country today. That's true, and we do have common law marriage. Correct. And that's my second point. That actually came up during voir dire in this case, where a Vernier member who became an alternate juror actually raised the question of, like, I know that I would like to know more about this common law marriage because I know it differs from state to state. So it's pretty obvious that, and as I also pointed out, this isn't part of the trial record, but at sentencing defense counsel pointed out to the judge that the interpreters were, even the interpreters were having a difficult time translating the concept of free union during the trial. And I should point out, I've done a search, and I can find no published circuit case that discusses free union and what it means and whether there's a need for instruction. There's just no case law on this. So I don't honestly know whether a religious ceremony would be a free union in Mexico. Maybe it just means getting together, cohabitation. We don't know. There was no evidence on this. Did the government argue inconsistently with the instructions that you proposed that weren't given? No. There was very little objection to any of the charges. I'm not talking about objection. I'm talking about in closing argument, for example, to the jury, did they say anything that was inconsistent with the instructions that you felt should have been given? Well, as you can see from the brief, the defense objected many times to burden shifting and lessening the burden because of arguments which the government made that Mr. Galvez had not proved that he was a derivative citizen, that the jury should just accept what the IJ had found about derivative citizenship, that there was not, that the evidence wasn't there to show the residency or that he was not because of the marriage question. These were brought up again and again during. What you're talking about now is who has the burden of proof and maybe the government's argument was misleading as to the burden of proof. But what I'm saying, is there anything that, for example, the government said, well, if he lives sometimes in Mexico and sometimes in the United States, he can't be a resident? It wasn't that explicit, Your Honor, no. But what they said was that the grandfather's residency requirement hadn't been met. And that was tied directly to a cross-examination that the prosecution made of Mr. Galvez, asking the otherwise irrelevant question of whether the grandfather only returned for seasonal work after he moved to Mexico after World War II. So there was really no reason to ask that, but to set up that argument later on. Well, simply because what different, if they were, if we had the actual correct definition of residency, which would allow for intermittent absences, it doesn't matter whether he had seasonal work or not, or what his nature was. Whether it was seasonal or not, because the testimony was that he had actually come back and lived in the United States for seven to ten years following the initial departure after December 1941. So there was no reason, the nature of his... I thought the evidence was he lived there for seven to ten years and then he left in 1941. No, no, he lived here from his birth in 1921. He was born right up the street here. But he needed to be there for some period of time after he turned... Correct, Your Honor. Since the testimony was that the family moved to Mexico sometime after the start of World War II, which would mean December 1941. At that point, his grandfather needed at most nine months of additional residence. And if they left after September 22, 1942, he'd already satisfied the residency. But assuming that he only needed that nine months at most... I was saying if he did seasonal work. He did seasonal work, which of course means the growing, the planting, growing and harvesting season. That's three quarters of the year. And that these were his prime working years between 1941 and his daughter's birth in 1947. The likelihood that he had accrued the additional nine months at most during those six years of prime working seems extremely likely that he met the residency requirement. Certainly enough to raise reasonable doubt. Far more than enough needed for an instruction on the issue. But the problem was the jury didn't know that resided wasn't precluded by intermittent absences from the country. Did the jury ask some question? Yes, they asked a question about the grandfather's moving to Mexico. Which is another sign that they were focused on the derivative citizenship question. It was the only contested issue in this trial. There was no question that Mr. Galvez had come into the country surreptitiously. And that he admitted prior, being ignorant of the whole concept of derivative citizenship, that he believed he was a Mexican citizen because he was born in Mexico. The most he knew, at most, was that his grandfather was born in the United States. But the experience of federal defenders is constant that it is not unusual that people don't know that they have derivative citizenship. Even when their own parents, one of their own parents, is an actual citizen. The instruction that was requested on residence was residence in the United States means that it was his principal place of residence even if he had spent some time out of the country. Would that instruction really have helped? I mean, isn't that something that people know that you, principal place of residence, I mean, when you say principal place, it suggests that he can be somewhere else sometimes. Perhaps it does suggest that, but there was no instruction on residence at all. There was nothing that suggested anything else. The only residence-related instruction was one that perhaps caused more confusion because there was the instruction relating to continuous presence needed for the mother. Continuous presence, of course, means unbroken presence. With nothing describing or defining residency, it's possible the jury might have understood this to be the same concept, that residency means continuous presence, the same way it did for the mother. But, of course, immigration was more complex and arcane than that. There's a difference between continuous presence and residence. These statues have changed since that time, too. I believe so, yes, Your Honor. And that's the thing. This was all presented to the district court according to the law in force at the time when these events occurred, and that, therefore, would apply to Mr. Galvez because it was his grandfather transmitting citizenship to his mother and his mother transmitting it to Mr. Galvez, even though both the mother and Mr. Galvez were born out of the country. But that is perfectly legitimate under American immigration law. There was no reason not to give you... His grandfather was born in the country, right? Yes, he was born right up Green Street here. I went past it this morning on the way to the court. Was he in Osgoode or not? No, he was at home, according to the birth certificate. Green Street. Yes. Well, it's not a home anymore. It's an office now. But that... And that was backed up not only by an American birth certificate but by a census report that showed that the family was living here in 1930 when he was 9 years old. Actually, at that time, families routinely crossed the border and would have places... I'm speaking from my own family, had places in both California and in Mexico and would go back and forth, and some of the kids would be born in the U.S. and some of the kids wouldn't be. Yes, and I think the census report indicates that at least some of the children who were reported were also U.S. citizens as well as the grandfather. We don't have any evidence on where the family was during that period. All we know is by family reputation that it's sometime after the start of World War II the family moved to Mexico, although the grandfather returned during his prime working years to work in the fields. I just want to mention briefly the Espinosa-Basa case, which was decided yesterday. I don't think that affects the argument I've made here, except in one respect. It certainly strengthens the defense argument here because Espinosa-Basa is an example of a properly denied derivative citizenship instruction because there the district court found the evidence supporting the instruction was only a scintilla, and therefore it actually properly excluded all of that evidence under Rule 403 because of the risk of confusion greater than its probative value. This court described the evidence's probative value as virtually zero. Now that's contrasted here where the district court described the evidence of derivative citizenship as strongly arguable. And plus let it all in. Let it in. And it actually encouraged more because the district court was concerned that maybe Agent Trombley wasn't the best vehicle for describing immigration law and invited defense counsel to bring in an expert. But defense counsel opted for thorough instructions by the court as opposed to taking up time bringing in an expert witness. Defense counsel felt that Agent Trombley's testimony plus the specific facts by Mr. Galvez's testimony combined with thorough legal instructions which the court, district court promised to give thorough instructions would make the case. The court did give pretty thorough instructions but surprisingly and inexplicably refused these two short instructions. But that is key because these instructions were highly necessary to understand the critical points of whether the parents were married and whether the residency requirement had been met. Without them the jury was floundering around without the tools it needed. All right, counsel. You're over your time. I'm sorry. Thank you. Thank you. Thank you. Good morning. Victor White for the United States. I want to start with touching on something that an appellant just mentioned which was that basically they had already decided not to call an expert witness but to rely on the district court judge to make a determination of the instructions on immigration law. And in the excerpts of record early on before even the conclusion, before the presentation of the defense's case, defense counsel indicated to the judge, and I'm reading from excerpt of record 110, judge, you're going to be our expert on immigration law. You're going to give a jury instruction on our theory of defense and what the immigration law requires. And here clearly what the instructions were, and the standard of review here is for abuse of discretion. The theory of defense was adequately covered, and I think the Espinoza-Baza case strengthens our position that it is for abuse of discretion because it's whether or not there was a factual foundation. Kagan. But that's not the issue here. The judge never said there wasn't a factual foundation. So I don't see any relationship. There were several times that the judge said that it's strongly arguable whether or not the factual predicate of the derivative citizenship, namely whether or not the defendant's mother had given birth to him out of wedlock, had been met. And so for that reason, the standard should be abuse of discretion under both the Gomez-Osorio case and the Espinoza-Baza. Kagan. No one is challenging. The district judge obviously thought there was sufficient evidence for this to go to the jury. It did go to the jury. So the only question is whether the instructions on which it went to the jury were adequate. That's not the only question. There are also ways it was a sufficiency question. But putting that aside, there's no argument here. I don't understand you to be making it, and I don't see how you could, that there wasn't sufficient evidence to send this issue to the jury. No, Your Honor. It's merely with regard to the level of review that these instructions as a whole should receive. And the instructions should be subject to the lesser standard of abuse of discretion because the theory of defense was adequately encapsulated in the ---- All right. That has nothing to do with the new case, which was under ---- and nothing to do with instructions. Well, the new case, the Espinoza-Baza case, looked at what standard of review should be given when there is a factual sort of dispute, an issue. And that's the only thing I'm relying on, but that's also citing the Gomez-Osorio. So I just want to briefly look at, again, what the instructions were here. Because there were four instructions. Now, Appellant wants to argue that the burden of proof was the burden was somehow shifted to the defendant. In no way, shape, or form was that burden of proof ever not on the government. The government ---- Counsel, I think the crux of this argument is that given the technical terms and the terms such as residence and marriage and out of wedlock, and that the ---- giving those instructions wasn't adequate because the ordinary juror wouldn't understand precisely what they meant. And we all have different notions of what ---- I think I just ---- I don't know if it's published yet, but we were just circulating a case talking about what does residency mean in terms of the venue statute for under the Immigration Act. And there's many definitions. And so how would a juror understand? Well, I think the jurors note, and also the length of the jury deliberations indicate that the jurors very well understood that resided, which is the term that was used in jury instruction number 12, defining alien, the ---- it's whether or not a U.S. citizen parent resided in the United States for 10 years prior to the child's birth, five of which were after age 16. Clearly, the fact that the jurors note were focused on whether the person resided in the U.S. or had moved back to Mexico indicates that this is one of those commonly understood terms. And appellant's contention that somehow it was emphasized, government counsel in no way, shape, or form argued in closing that somehow the physical presence was broken by seasonal work. In fact, it was actually defense counsel who raised the whole issue of seasonal work in their closing. And as far as the burdens of proof, there were four instructions that clearly set forth that the burden of proof on alien ---- There wasn't a challenge to the burden of proof. There were only two, as I understand it. One is residency and the other one is the definition of marriage. Now, certainly ---- excuse me, just a minute. Would you think it is self-evident whether or not something that somebody would think is either a common law marriage or a religious marriage counts or doesn't count? People are just supposed to know that walking around the street. I think it's basically far afield from what the actual issue was here. The issue was whether or not the government was able to prove beyond reasonable doubt that the defendant was an alien. The instruction on alienage doesn't refer to marriage, doesn't refer to unmarried or married. It refers to born out of wedlock. And this Court, when it's examined the issue of that statute with regard to a biological relationship, didn't even go into a definition of marriage or born out of wedlock. That's in the Scales case, also in the Solis-Espinosa case. So, again, the fact that whether one's born out of wedlock or born in wedlock is something that the jurors would be able to determine. In fact, when the defendant was asked, do you know the difference between being married and not married, the defendant indicated that he knew that difference based on his own life experiences. So once we start going far afield into the issues of common law marriage and free union, I think we've gone away from what really the review is here. It's whether the instructions on a whole adequately guided jury deliberations. And here it was clear that from the definition that the judge provided, where the focus of the term is on out of wedlock, not on the term marriage or married or common law marriage, that the jurors were able to make a determination. Out of wedlock means not in wedlock. Not in wedlock means not married. The question is, what is wedlock for purposes of the statute? You could use some – maybe the problem wasn't shouldn't have said marriage. It should have said wedlock. I mean, I don't really understand what your point is about it's out of wedlock. It's not about marriage. Because the statute itself doesn't use the word marriage. Right. So you could have objected and said one shouldn't say marriage. It should say wedlock. But other than that, what's the problem? But the instruction itself didn't use marriage. The instruction itself was correct statement of the law, which used out of wedlock. What does that out of wedlock mean to you? Well, out of wedlock means that you're basically born while the parents were not married. Exactly. Therefore, you're back to married. Well, but it's going back to what the language in the statute is and what the evidence was that was presented at trial. The evidence that was presented at trial was the defendant six months before illegally entering was asked by an immigration judge, were your parents married? And the defendant answered yes. Then illegally reenters. And in defense, he gets a theory of defense instruction. It was conflicting evidence because he said that. But then he also said when he got more specific that he didn't he now believed that they had not, in fact, gone through a marriage ceremony. Well, yes. Based on family reputation and, you know, this was hearsay evidence that was brought in through the court. That's what they both were. When he said they were married, that was no more knowledgeable than the other. Right? Well, no. Because when he was asked when they were married, that was when he wasn't basically on trial. I know. But what I'm asking you is anything he knew about whether his parents were married or weren't married had to be by family history. It had. Well, the first time it was asked and the second time it was asked. Well, the only difference is that by the time of the trial, they introduced the mother's birth certificate. And on the mother's birth certificate, both the grandfather and the grandmother are listed in the immigration proceedings. He's asked whether or not he knew if his grandparents were married. So, again, we start asking basis for marriage for the mother. Then we ask basis for. Did the birth certificate say they were married? No. The birth certificate didn't indicate whether or not they were married, but it listed both. But what is your point about it said that it had the grandmother and grandfather on the birth certificate? My point is just to establish, again, the knowledge of marriage, because then when we look at the birth certificate, his birth certificate, it lists both his mother and his father. While it doesn't say anything about marriage, again, we're dealing with an issue of what was the evidence that was presented that basically hit. It's not very usual to have mothers and fathers on birth certificates when they're not married? Excuse me? And it's not very usual to have mothers and fathers on birth certificates when they're not married? Oftentimes in immigration law, with regard to legitimation, that's where the whole issue of paternity usually turns. That's paternity. It's not marriage. I'm really not understanding your argument. Could you try and spell it out for me? Certainly. Basically, in immigration law, the statute uses the term out-of-wedlock. In other portions of the statute, they use the term legitimation. When the focus has been basically on whether or not paternity has been established, the focus has always been on that issue of legitimation. So, again, born out-of-wedlock is one that the courts haven't even really delved into, because, again, it's one of these terms that's understood. And, again, the issue here was not whether the government, because as the Senate case points out, not whether the government disproves derivative citizenship. It's whether the government proves beyond a reasonable doubt that the defendant's an alien. What was the point of the government's suggestion that if these two instructions were given, there should be an instruction on legitimation? Was there an issue? Was there a legitimation issue in the case? Well, the issue then became with the birth certificate that came in that was basically listing the father there. So if we had previous evidence of the defendant answering an unambiguous question whether or not your parents were married, and he answers yes to that, and now all of a sudden he's on trial, and he's trying to point out that he didn't know whether or not his parents were married, because that's what the evidence was, that basically we were going so far afield from what was already necessary to be provided. And the government did not object to a separate theory of defense instruction which basically set forth that the Mr. Galvez could derive citizenship from his mother under the applicable law. And that, the statute, the relevant statute, was set forth in court instruction number 12. And you didn't object to the residence instruction that was requested by the defendant? To that specific instruction, I didn't. But the court was already we were going through basically comparing the court's instruction 12 with the proposed instruction which is at the excerpt of record 8. And the problem with the excerpt of record 8 is that it mixes theory and law. And so the residence, while it's one sentence, it couldn't have been given as proposed because it was basically his theory of defense that tacked on this idea of residence. And what's wrong with that? Basically, it's mixing theory and law. So we didn't object to a separate theory of defense instruction. But to then go on with a separate definition of residence. But a theory of defense has to be a law. In other words, you can't have an instruction that says it's a theory of defense without saying whether it's a legitimate theory or a nonlegitimate theory. Ultimately, a theory of defense instruction is that incorporates some sanction of the theory, i.e., if you find these elements, it is, in fact, the law that acts. That's correct, Your Honor. And what we set forth and what we agreed to with the definition of alien, where they were using just the term resided, and you're looking at whether or not someone resided in the country for the requisite time period, that was sufficient. Again, this is a term that's … Before you went to law school, did you know what the term residency usually meant? I.e., that it didn't mean necessarily whether they are physically present, but it meant some sort of state of mind? I knew that, basically, colleges have their own residency requirements, so they'll charge you higher tuition if you're an in-state resident or an out-of-state resident. And, in fact, that's highly disputed, right? Correct. And different rules at different states have different rules at different times about that. But here, again, the main issue was whether the government proved beyond a reasonable doubt that the defendant was an alien. The defendant received a separate theory of defense instruction, and that instruction provided, again, under the applicable law. And the jury was properly instructed as to the law. The instruction is a correct statement of the law. The defendant didn't object to the statement of the law as to using the term resided or out-of-wedlock, which is a correct statement of the statute. All right. Does anyone have anything else to add? If I could just briefly address, with regard to harmless error, if the Court were to defense where it's based on a grandfather's, a maternal grandfather's birth in the United States. The mother was born in Mexico, and the defendant was born in Mexico. And so the jury could have found the government proved beyond a reasonable doubt based on the fact that the grandfather's residency requirement wasn't met. Therefore, it didn't even go to, didn't transmit to the mother, which would obviate the need for discussion as to whether he was born out of wedlock or in wedlock. That goes to the sufficiency argument, right? To the sufficiency argument, but also to the issue of the jury instruction on wedlock, on marriage, because it could have been decided just solely based on the government's proof of alienage and the fact that the grandfather didn't meet the residency requirement. All right. Thank you. Thank you. All right. U.S. v. Galvez-Guerrero will be submitted.
judges: Whyte, Wardlaw, Berzon